UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DASHUNA RICHARDS AND
EDDIE HARRIS,

                Plaintiffs,

                                    Case No. 16-cv-13520

v.                                Honorable Linda V. Parker

CITY OF JACKSON AND MATTHEW
PETERS, in their individual and official
capacities,

                Defendants.

_____/

## ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 45)

On September 29, 2016, Plaintiffs DaShuna Richards and Eddie Harris (collectively "Plaintiffs") brought this § 1983 suit against Defendants City of Jackson and Matthew Peters, police officer, (collectively "Defendants") for the shooting and killing of their dog during an unlawful entry of their home. (ECF No. 1.) Currently pending before the Court is Defendants' Motion for Summary Judgment, filed November 9, 2017. (ECF No. 45.) The motion has been fully briefed. Finding the legal arguments in the parties' briefs sufficient, the Court is dispensing with oral arguments pursuant to L.R. 7.1(f)(2). For the reasons stated

below, the Court grants, in part, and denies, in part, Defendants' motion for summary judgment.

## I.  Factual Background

On November 28, 2014, Officer Matthew Peters and Lewis Costley were executing an order by Jackson County Probate Judge Diane Rappleye to take Donte Cox into custody and transport him to Allegiance Health Hospital.  (ECF No. 45 at Pg ID 314.)  Mr. Cox was believed to be a threat to himself and others and possibly located at 511 and 513 South Blackstone in Jackson, Michigan.  (*Id.*) The two properties are a part of a quadplex.  (ECF No. 52 at Pg ID 663.)  Each unit has separate and distinct entry points, separate and identifiable mailboxes and addresses outside the door.  (*Id.*)

At the time, Plaintiffs resided at 513 South Blackstone with their dog, Kane Lee Chaney ("Kane").  (ECF No. 45-3 at Pg ID 544, DaShuna Richards Dep. Tr. 5:4-5 (Apr. 26, 2017).)  On the date of the incident, Plaintiff Richards had gone to her brother's hotel to complete a homework assignment.  (ECF No. 45-3 at Pg ID 549, Richards Dep. Tr. 28:24-29:4.)  Plaintiff Harris was at the residence with Plaintiff Richards' younger brother, Jaquan Caddel.  (ECF No. 45-4 at Pg ID 572, Eddie Harris Dep. Tr. 33:1-3 (May 2, 2017).)  The two were in the bedroom

2

playing a video game while Kane laid across the bed.  (ECF No. 45-4 at Pg ID 572, Harris Dep. Tr. 33:13-17.)

Officer Costley went to 511 Blackstone, and Officer Peters went to the adjoining property, 513 Blackstone.  (*Id.*)  Officer Peters testified that when he arrived at the 513 property, he assumed it was a multi-dwelling unit, despite noticing the single address outside of the two units.  (ECF No. 45-7 at Pg ID 593, Matthew Peters Dep. Tr. 25:10-15; 28:12-22 (May 23, 2017).)  Because Officer Peters found the interior door opened and the screen door unlocked, he walked into the property.  (ECF No. 45-7 at Pg ID 593, Peters Dep. Tr. 25:20-26:6.)  Upon entering the property, Officer Peters testified that he was in a foyer and noticed steps leading to a second floor that had a door removed.  (ECF No. 45-7 at Pg ID 594; Peters Dep. Tr. 29:24-30:9.)  Officer Peters testified that because he did not know what was upstairs, he knocked on the wall to notify the occupants of his presence.  (ECF No. 45-7 at Pg ID 593, Peters Dep. Tr. 26:4-12.)

The parties dispute what happened next.  According to the patrol car audio, after Officer Peters is heard knocking, Plaintiff Harris yelled, "Who the fuck is it?" to which Officer Peters responded, "Police."  (ECF No. 52-5.)  Immediately following that exchange, Kane is heard growling, barking, and running down the stairs.  (*Id.*)  Although Officer Peters stated that he yelled, "Get your fucking dog,"

3

if the statement was made, it was not clear from the audio.  (ECF No. 45 at Pg ID 317; ECF No. 52-5.)  During the commotion, there appeared to be no sound from Plaintiff Harris.  (ECF No. 52.5.)  Six seconds from hearing Kane descending the stairs, Officer Peters discharged his weapon, killing Kane.  (*Id.*)  Officer Costley observed part of Officer Peters' interaction with Kane and stated that he witnessed Kane viciously growling at Officer Peters' feet.  (ECF No. 45-10 at Pg ID 617.)

Plaintiffs testified that Officer Peters stated that Kane bit him, and he states he shot Kane because he was biting him, which was captured in the audio.  (ECF No. 45-3 at Pg ID 551, Richards Dep. Tr. 36:5-14; ECF No.45-4 at Pg ID 573, Harris Dep. Tr. 40:4-5; ECF No. 52-5.)  In Officer Peters' deposition, however, he testified that Kane did not bite him, but he was biting at his feet.  (ECF No. 45-7 at Pg ID 592, 595, Peters Dep. Tr. 24:7-8; 35:2-3.)  Plaintiff Harris stated that Kane did not bite people because he was a trained dog, and, on the date of the incident, Kane was trying to prevent Officer Peters from coming up the stairs.  (ECF No. 45-4 at Pg ID 573, Harris Dep. Tr. 38:20-39:1.)

Plaintiffs filed a complaint with the Jackson Police Department on December 11, 2014.  (ECF No. 45-12.)  A police investigation found Officer Peters did not violate any departmental policies or procedures and acted reasonably under the circumstances.  (ECF No. 45-13.)  On September 29, 2016, Plaintiffs filed a

4

six-count complaint, alleging the following federal and state law claims (1)

violation of the Fourth Amendment 42 U.S.C. § 1983 unreasonable search and

seizure for the killing of Kane; (2) violation of the Fourth Amendment 42 U.S.C. §

1983 unreasonable search and seizure for unlawfully entering Plaintiffs' home; (3)

municipal liability as to the City of Jackson; (4) conversion; (5) intentional

infliction of emotional distress; and (6) gross negligence.  (ECF No. 1.)

## II.    Standard of Review

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed.  R. Civ. P.

56(a).  The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden

of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed.  R. Civ. P. 56(c)(1).  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See Liberty Lobby*, 477 U.S. at 255.

## III. Applicable Law & Analysis

### A. § 1983 Claim and Qualified Immunity

Plaintiffs assert §1983 claims for violations of their Fourth Amendment right.  "Section 1983 establishes 'a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States.'"  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940-41 (6th

6

Cir. 2010) (quoting *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994)).  A plaintiff asserting a § 1983 claim must show: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

To establish personal liability under § 1983, the plaintiff must show that each defendant charged "caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Stated differently, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  "[T]he personal responsibility requirement is satisfied if the official 'acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Diebitz v. Arreola*, 834 F. Supp. 298, 304 (6th Cir. 1993).

Qualified immunity "shields 'government officials performing discretionary functions … from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  Once raised, the plaintiff bears

7

the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

A court makes two inquiries when determining whether a defendant is entitled to qualified immunity: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Although the *Saucier* Court mandated that these questions be addressed in order, that requirement has since been relaxed.  *See Pearson*, 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

With regard to the second step,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

8

*Anderson*, 483 U.S. at 640 (citations omitted).  When deciding whether a constitutional right is clearly established, a court in the Sixth Circuit must "'look first to decisions of the Supreme Court, then to decisions of th[e Sixth Circuit] and other courts within [the] circuit, and finally to decisions of other circuits.'"  *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)).  The court must "examine the asserted right at a relatively high level of specificity[,]" and "on a fact-specific, case-by-case basis[.]"  *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997) (citations and internal quotation marks omitted).  When deciding whether officers are entitled to qualified immunity, "the [c]ourt considers only the facts that were knowable to the defendant officers."  *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 550 (2018) (citing *Kingsley v. Henrickson*, -- U.S. --, 135 S. Ct. 2466, 2474 (2015)).  Ultimately, "[q]ualified immunity provides government officials breathing room to make reasonable but mistaken judgment, and protects all but the plainly incompetent or those who knowingly violate the law."  *Brown v. Battle Creek Police Dep't*, 844 F.3d 556 (6th Cir. 2016).

Plaintiffs contend that Officer Peters violated their Fourth Amendment rights in two ways: unlawfully entering their home without a warrant, consent, or exigent circumstances and unlawfully killing their dog Kane.

9

### 1.  Unlawful Entry

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend IV.  "'[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' If the government wants inside, they need a warrant, consent, or an exigent circumstance to justify their entry."  *Brenay v. Schartow*, No. 17-1009, 2017 U.S. App. LEXIS 17817, at *6 (6th Cir. Sept. 12, 2017).  To succeed on a Fourth Amendment claim, plaintiff must demonstrate that she or he had a legitimate expectation of privacy in the place invaded.  *United States v. Allen*, 770 F. App'x 254, 257 (6th Cir. 2018) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967).

> A person—whether a social guests or renter—has a reasonable expectation of privacy in the place where he sleeps at night.  To determine whether such an expectation of privacy is reasonable, the court considers "the person's proprietary or possessory interest in the place to be searched or the item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*Allen*, 770 F. App'x at 257.

10

It is undisputed that Officer Peters did not have a warrant, consent, or exigent circumstances when he entered Plaintiffs' residence. Defendants contend that because the interior door was open and Officer Peters was able to open the screen door and enter without restriction, he believed he was in the common area of a multi-dwelling unit. As such, Defendants assert that multi-dwelling units do not have a generalized expectation of privacy in common areas. However, 513 Blackstone does not fit squarely into what we commonly refer to as a multi-unit dwelling. *See e.g. United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2001). While a quadplex is technically a multi-unit dwelling, the proper character of Plaintiffs' residence is more like a single-family home. Further, Plaintiffs' property does not have a "common area" as Defendants suggest, for no other tenant in the quadplex has access to Plaintiffs' foyer. The foyer of 513 Blackstone is not subject to the control of any other residents of the quadplex, each unit having its own entry/exit, separate and distinct mailboxes and addresses.

After entering through Plaintiffs' interior door, there is a foyer that leads to a stairwell and eventually into her living room. Plaintiff Harris testified that people would often get her "door and home" confused. (ECF No. 45-3 at Pg ID 555, Harris Dep. Tr. 50:15-19.) Although Plaintiffs' actual living space did not begin until upstairs, the foyer was a part of the home and within their control. Further,

Plaintiff Harris testified that she would lock the interior door because she did not intend for people to "walk in[to]" her home. (*Id.*) Although Officer Peters testified that the interior door was open and he could not recall if the screen door was broken, that does not eliminate Plaintiffs' expectation of privacy.

Whether it was unreasonable for Officer Peters to assume Plaintiffs' home consisted of multiple dwelling units, and he unlawfully entered Plaintiffs' home presents a genuine issue of material fact, which should be determined by the factfinder.

### 2. Unreasonable Seizure of Kane

At the outset, the Court notes that the Sixth Circuit has stated that a dog is property, and the unreasonable seizure of a dog runs afoul of the Fourth Amendment. *Brown*, 844 F.3d at 566. "A 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty, Ill.*, 506 U.S. 56, 61 (1992). Courts have held there is no unreasonable seizure when an officer kills a dog if the dog is an imminent threat. *Brown*, 844 F.3d at 567. "[I]n circumstances where the dog does not pose an imminent threat, or the officer is not surprised by the dog and has had time to make alternate plans to control the dog, other than shooting," the shooting of the dog is an unreasonable seizure. *Bateman v. Driggett*, No. 11-

13142, 2012 U.S. Dist. LEXIS 91221, at *20 (E.D. Mich. July 2, 2012).  In determining whether an officer unreasonably seized a dog, the Court considers the totality of the circumstances and the perspective of a reasonable police officer on the scene, including the need to make split-second decisions, rather than 20/20 hindsight.  *Id.*  The task of the Court is "to put itself in the shoes of the officers at the time the actions took place and to ask whether the actions taken by the officer were objectively unreasonable.  *See Hayes v. City of Detroit*, No. 16-13098, 2017 U.S. Dist. LEXIS 175735, at *4 (E.D. Mich. Oct. 24, 2017).

The underlying question here, however, is whether Officer Peters was lawfully in Plaintiffs' home.  In the audio, Kane is heard descending stairs, barking, and growling, as what is naturally expected of a dog when a stranger enters its home.  *Hiner v. Mojica*, 271 Mich. App. 604, 612 (Mich. Ct. App. July 20, 2006) ("[T]he mere fact that a dog barks, growls, jumps, or approaches strangers in a somewhat threatening way is common canine behavior. Thus, such behavior will ordinarily be insufficient to show that a dog is abnormally dangerous or unusually vicious.")  Further, Officer Costley stated that Kane was growling at Officer Peters, not attacking him as Officer Peters alleged.  Furthermore, in the audio, Officer Peters stated that Kane bit him.  Additionally, Defendants argue that Plaintiff Harris made no effort to restrain Kane.  However, there were six seconds

13

from the moment Kane is heard barking until Officer Peters' fired his weapon. Further, although Defendants maintain that Officers Peters told Harris to get his dog, this is not heard in the audio, creating a disputed fact. Therefore, whether a reasonable jury could find that Kane did not attack Officer Peters, and Officer Peters acted unreasonably when he failed to give Plaintiff Harris an opportunity to contain Kane prior to shooting and killing him presents a genuine issue of material fact, which should be determined by the factfinder.

### B. Municipal Liability

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), a municipality may be held liable for the deprivation of a plaintiff's constitutional rights only where the deprivation results from an official custom or policy of the municipality. *See also Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254-55 (6th Cir. 2010) (the plaintiff must show that his constitutional rights were violated and that a policy or custom of the county was the "moving force" behind the deprivation of his rights).

Pursuant to *Monell* and its progeny, municipal liability attaches only, "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, and there is an "affirmative link

14

between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 818-19 (6th Cir. 2005). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Tuttle*, 471 U.S. at 824. However, a municipality is not liable under § 1983 for the conduct of its employees or agents under the theory of respondeat superior. *Bennett*, 410 F.3d at 818 (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).

### 1. Officer Peters in His Official Capacity

Plaintiffs allege that both the City of Jackson and Officer Peters, in his official capacity, are liable under §1983. However, Officer Peters may not be sued in his official capacity. "[O]fficial-capacity suits are only another way of pleading an action against the entity the official represents, and therefore suits against state officials in their official capacity are treated as suits against the state." *Sanchez-Orozco v. Livonia Police Dep't*, 08-cv-14297; 08-cv-14299, 2009 U.S. Dist. LEXIS 81112, at *13 (E.D. Mich. Sept. 2008) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))). As such, suing the City of Jackson, as

15

Plaintiffs have done, is sufficient for a *Monell* claim, and naming Officer Peters in his official capacity is redundant.  Therefore, Plaintiffs' Fourth Amendment claims against Officer Peters in his official capacity are dismissed.

### 2.  City of Jackson

As to the municipality claim against the City of Jackson, Plaintiffs can make this showing by demonstrating one of the following:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).  Accordingly, Plaintiffs assert a failure to train theory.  The Sixth Circuit has established that a plaintiff must prove the following to prevail on a failure to train or supervise claim:

> (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  We have further elaborated that, "[t]o show deliberate indifference, Plaintiff[s] must show prior instances of unconstitutional conduct demonstrating that the [city] has ignored a history of abuse and was clearly

16

> on notice that the training in this particular area was
> deficient and likely to cause injury."

*Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting

*Plinton v. Cnty. of Summit*, 450 F.3d 459, 464 (6th Cir. 2008)).  The focus is

on the "adequacy of the training program in relation to the tasks the

particular officers must perform.  That a particular officer may be

unsatisfactorily trained will not alone suffice to fasten liability on the city,

for the officer's shortcomings may have resulted from factors other than a

faulty training program."  *City of Canton v. Harris*, 489 U.S. 378, 390-91

(1989).  Further, the fact that some officers make mistakes says very little

about a training program.  *Id.* at 391.

Plaintiffs offer no evidence for its failure to train/supervise theory.

First, Plaintiffs do not provide any case law as to how Officer Peters'

unrelated conduct following the incident is relevant to its failure to

train/supervise claim.  Next, Plaintiffs contend that because Officer Peters

had instances of improper conduct, it supports the theory that he was

improperly trained or supervised.  However, out of the five complaints

against Officer Peters that Plaintiffs provided, only one of them related to an

incident similar to this one, in which Officer Peters allegedly unlawfully

entered someone's home.  Moreover, there is no reference as to how these

17

complaints were resolved.  A single incident is insufficient under a *Monell* claim.  Plaintiffs fail to offer any evidence that the Jackson Police Department's training program relating to the incidents alleged here is inadequate, and the inadequacy is based on the City's deliberate indifference.  The record does not support a history of unconstitutional conduct involving unlawful entries into homes or unlawfully shooting dogs. Therefore, failing to make such showing, Plaintiffs' municipality claim is dismissed.

### C.  State Law Claims

Plaintiffs assert state law claims for conversion, intentional infliction of emotional distress, and gross negligence.

### 1.  Conversion

Under the common law, conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."  *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992).  "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party."  *Dep't of Agric. v. Appletree Mktg. LLC*, 485 Mich. 1, 779 N.W.2d 237, 244-45 (2010).

18

Defendants argue that Plaintiffs do not have a legitimate interest because Kane was unlicensed.  Further, Defendants refer the Court to Mich. Comp. Laws §§ 287.279 and 287.287.  Section 287.279 authorizes "a law enforcement officer [to] kill any dog which he sees in the act of pursuing, worrying, or wounding any livestock or poultry or attacking persons, and there shall be no liability on such person in damages or otherwise, for such killing."  Section 287.287 provides that "[n]othing in this act shall be construed to prevent the owner of a licensed dog from recovery, by action at law, from any police officer or other person, the value of any dog illegally killed by such police officer or other person."

Those provisions do not protect Defendants, as a matter of law.  First, contrary to what Defendants argue, Kane was Plaintiffs' property.  Second, § 287.279 does not justify Officer Peters' killing an unlicensed dog.  The killing of *any* dog is *only* permissible when the dog is "pursuing, worrying or wounding livestock or poultry *or* attacking persons."  The Court finds the question of whether Kane was "attacking" Officer Peters is for the factfinder.  Furthermore, Defendants have provided no Michigan case law that permits the killing of an unlicensed dog in its home by a police officer.  This is a matter for the jury, and, therefore, Plaintiffs' conversion claim is not dismissed.

19

### 2.  Intentional Infliction of Emotional Distress

To set forth a claim for intentional infliction of emotional distress, Plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress."  *Gibbs v. Voith Industry Servs.*, 60 F.Supp.3d 780, 801 (E.D. Mich. 2014).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.* at 802 (citing *Lavack v. Owen's World Wide Enter. Network, Inc.*, 409 F.Supp.2d 848, 857 (E.D. Mich. 2005).

Plaintiffs claim intentional infliction of emotional distress for the shooting and killing of Kane.  However, Michigan law does not recognize recovery for emotional injuries suffered from property damage, and undisputedly, Kane was property.

> In *Koester v VCA Animal Hosp*, 244 Mich. App. 173; 624 N.W. 2d 209 (2000), the plaintiff dog owner sought noneconomic damages in a tort action against his veterinarian following the death of his dog resulting from the veterinarian's negligence. The trial court granted the defendant's motion for summary disposition, holding that "emotional damages for the loss of a dog do not exist." *Id.* at 175. On appeal, the Court of Appeals affirmed, noting that pets are personal property under Michigan law and explaining that there "is no Michigan precedent that permits the recovery of damages for emotional

injuries allegedly suffered as a consequence of property damage." *Id*. at 176.

*Price v. High Pointe Oil Co*., 493 Mich. 238, 251, 261-62 (Mich. 2013) ("[E]conomic damages, unlike noneconomic damages, are easily verifiable, quantifiable, and measurable.  Thus, when measured only in terms of economic damages, the value of property is easily ascertainable.  Employing market prices in calculating compensation for property damage eliminates the need to engage in subjective determinations of property value and enables the legal system to undertake commonplace and precise determinations of value.")

Therefore, Plaintiffs' claim for intentional infliction of emotional distress is dismissed.

### 3. Gross Negligence

Under Mich. Comp. Laws § 691.1407(1), aside from certain exceptions, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."  Governmental immunity is also provided to individual employees engaged in the exercise or discharge of a governmental function.  *Beals v. Michigan*, 871 N.W.2d 5 (Mich. 2015).  "An employee of a governmental agency acting within the scope of his or her authority is immune from tort liability unless the employee's conduct amounts to gross negligence that is the proximate cause of the injury."  *Kendricks v.*

21

*Rehfield*, 716 N.W.2d 623, 625 (Mich. Ct. App. 2006); *see also* Mich. Comp. Laws § 691.1407(2).

Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern whether an injury results." *Poppen v. Tovey*, 256 Mich. App. 351, 356 (Mich. Ct. App. 2003). To establish proximate cause, the employee's gross negligence must be "the one most immediate, efficient, and direct cause of the injury or damage." *Robinson v. Detroit*, 613 N.W.2d 307, 319 (Mich. 2000). "If no facts are in dispute, or if reasonable minds could not differ regarding the legal effect of the facts, the question whether the claim is barred by governmental immunity is an issue of law." *Radu v. Herndon & Herndon Investigations, Inc*., 302 Mich. App. 363, 382 (Mich. Ct. App. Aug. 29, 2013) (citing *Pierce v. Lansing*, 265 Mich. App. 174, 177; 694 NW2d 65 (2005)).

It is undisputed that Officer Peters was engaged in a government function on the day of the incident. It is also undisputed that Officer Peters was the proximate cause of Kane's death because he fired his weapon, killing Kane. The case law makes clear that for a government official to be found grossly negligent, the official must be the "most immediate, efficient, and direct cause" of the plaintiff's injury. The inquiry becomes whether Officer Peters was grossly negligent in that his conduct was so reckless as to demonstrate a substantial lack of concern whether

an injury results.  The Court finds that that is a factual dispute better suited for the factfinder.

Accordingly,

**IT IS ORDERED** that Defendants' motion (ECF No. 45) is **GRANTED, in part, and DENIED, in part**: and

**IT IS FURTHER ORDERED** that Defendants' motion is granted to the extent that (1) Plaintiffs' Fourth Amendment claims against Officer Peters in his official capacity are **DISMISSED**; (2) Count III, municipality liability, is **DISMISSED** against the City of Jackson; and (3) Count V, intentional infliction of emotional distress, is **DISMISSED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 27, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, August 27, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager