# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  September 17, 2019

Mr. Shawn C. Cabot
Ms. Amy Jean DeRouin
Mr. Christopher J. Trainor
Christopher Trainor & Associates
9750 Highland Road
White Lake, MI 48386

Ms. Mary Massaron
Plunkett Cooney
38505 Woodward Avenue
Suite 100
Bloomfield Hills, MI 48304

> Re:  Case No. 18-2024, *DaShuna Richards, et al v. City of Jackson, Mich., et al*
> Originating Case No. : 4:16-cv-13520

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0484n.06

**Case No. 18-2024**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DASHUNA RICHARDS; EDDIE HARRIS, | ) | |
| | ) | |
| *Plaintiffs-Appellees,* | ) | |
| | ) | |
| CITY OF JACKSON, MICHIGAN, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| MATTHEW PETERS, in his individual and official capacity, | ) | |
| | ) | **O P I N I O N** |
| *Defendant-Appellant.* | ) | |

```
┌─────────────────────────────┐
│          FILED              │
│       Sep 17, 2019          │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

BEFORE:    COLE, Chief Judge; SILER and CLAY, Circuit Judges.

COLE, Chief Judge.  It is undisputed that Officer Matthew Peters had no warrant, exigent circumstances, or consent to enter the residence of plaintiffs DaShuna Richards and Eddie Harris on November 28, 2014.  But when Peters approached their front door—which Peters claims he believed would lead to a common area, even though the plaintiffs' door was clearly marked with an individual house number and had its own mailbox and doorbell—he opened it without knocking and walked inside.  Once inside, Peters announced his presence, which prompted the plaintiffs' pet dog Kane to run down the stairs and growl at the officer who was inside his home.  Harris testified that although Kane was well-trained and did not bite or lunge at the officer, Peters shot Kane as soon as the dog reached the bottom of the staircase.

Richards and Harris brought a cause of action against Peters, alleging that he unlawfully entered their home and shot their dog in violation of the Fourth Amendment and Michigan state law.  Peters moved for summary judgment on grounds of qualified immunity and Michigan governmental immunity, and the district court denied his motion as to the plaintiffs' Fourth Amendment claims and state-law claims of conversion and gross negligence.  We affirm.

## I. BACKGROUND

In 2014, DaShuna Richards, Eddie Harris, and their pet dog Kane Lee Chaney ("Kane") lived together at 513 South Blackstone Street in Jackson, Michigan.  Richards bought Kane in 2009, and Richards and Harris shared responsibility for Kane over the five years that followed: Harris trained Kane, and Richards fed and cared for him.  Richard and Harris describe Kane as a well-trained American Pit Bull Terrier who had never displayed aggression toward other animals or people.

On November 28, 2014, two police officers arrived at 513 South Blackstone Street for reasons unrelated to Richards, Harris, or Kane.  On November 20, 2014, a probate judge had ordered a man named Donte Cox to report to Allegiance Health Hospital, as he had failed to pick up his prescribed medication.  If Cox did not appear at Allegiance Health, the order stated that police officers would take Cox into protective custody and transport him to the hospital.  When Cox failed to appear, the Jackson Police Department dispatched Officers Matthew Peters and Lewis Costley to look for Cox at several addresses in Jackson, including 511 South Blackstone Street and 513 South Blackstone Street.  Cox did not live at 513 South Blackstone Street in 2014, and it is unclear from the record whether Cox had ever lived at either Blackstone address.

Peters and Costley began looking for Cox at the addresses provided by dispatch, which led them to the plaintiffs' address.  Upon arriving at 511 and 513 South Blackstone Street, the officers found the two units were part of the same building.  Each unit had a separate door on the exterior of the house, and each door was conspicuously labeled with a single, distinct address identifying the residence inside.  Each door was also accompanied by its own mailbox, and the door marked "513" had its own doorbell as well.

Case No. 18-2024, *Richards v. City of Jackson*

Costley went to the door labeled "511," and Peters went to the door labeled "513." Costley knocked on the door at 511 Blackstone, waited, and did not receive a response, so he did not enter the residence. Peters, in contrast, approached the door at 513 Blackstone and walked inside without knocking or ringing the doorbell. Peters admits he had no search warrant, no consent to enter the home, and no exigent circumstances that would have permitted him to enter the home absent a warrant or consent. But Peters contends that the front screen door was slightly ajar and there was no solid door behind the screen door, so he presumed that the door led to a common front entry for multiple apartments, despite his acknowledgement that only one house number— 513—was listed next to the door.

In contrast, Richards and Harris testified that the door was not a common entry. Instead, they contend that Peters walked through the front door of their home—a door that did not provide entry to any unit other than 513, as indicated by the address marked next to the doorway. Both Richards's testimony and multiple photographs of the property contradict Peters's description of the door. There were actually two doors at the entryway to 513 Blackstone: the screen door that Peters describes, as well as a second solid white door immediately behind the screen door. Harris maintains the screen door was closed before Peters entered the home and that he heard the screen door creak open upon Peters's entry. The audio recording from Peters's body microphone captures a sound consistent with the creaking that Harris describes.

Upon entering through the doorway, Peters saw a small foyer, a flight of stairs, and an additional door at the top of the stairs. The door at the top of the stairs opens into Richards's and Harris's living room, where Harris was playing video games with Richards's younger brother, Jaquan Caddell. Kane was lying nearby. While Harris and Caddell were playing video games, they heard the screen door "creep open" and heard "footsteps in the doorway," alerting them that someone was inside the home. (Harris Dep., R. 45-4, PageID 572.)

Standing inside the foyer, Peters knocked on the interior wall of the apartment. After the knock, the audio recording from Peters's body microphone captures Harris yelling from the living room, "Who the f–ck is it?" (Peters Audio at 1:39.) Peters responds, "Police." (*Id.* at 1:42.) Right after Harris yells and Peters responds, the audio recording captures the sound of Kane running and

growling for four seconds. (*Id.* at 1:43–1:47.) Peters then contends that he said, "Get your f–cking dog," but Harris contends that he could not hear Peters saying anything to him. (Peters Dep., R. 45-7, PageID 594.) The audio recording captures Peters saying ". . . [expletive] dog," but the recording quality makes it difficult to discern the full quote or how loudly Peters was speaking. (Peters Audio at 1:47–1:48.) Kane continues to make noise, though it is unclear whether the sound is running, growling, or some combination of the two. Within two seconds of Peters saying "[expletive] dog," the audio recording captures him shooting and killing Kane.

What the audio recording does not capture—and what is hotly contested—is what Kane, Harris, and Peters were doing during the six seconds between the time Kane began running from the living room and the time at which he was shot. Both Harris and Peters agree that Kane ran down the stairs and growled. But from there, the witnesses to the shooting provide differing stories about what took place.

Harris testified that Kane began running down the stairs to prevent Peters from coming up the stairway, because Peters "was trying to creep in and creep upstairs without saying nothing." (Harris Dep., R. 45-4, PageID 573.) At the time that Peters shot Kane, Harris contends that he was going down the stairs to get his dog, but that Peters fired the shots before he could reach Kane. Harris testified that Peters shot Kane as soon as Kane got to the bottom of the stairway.

In contrast, Peters wrote in his police report that Kane immediately ran down the stairs, "came directly to his feet," and "began growling, snarling, and biting at my feet and ankles." (Police Reports, R. 28-2, PageID 174.) Peters wrote that he "yelled for someone to come get the dog and kicked at it," but that "[o]ne kick sent the dog back against the bottom of the stairs only to have it charge back at [Peters] again biting at [his] legs." (*Id.*) Peters later testified that he did not try to exit the apartment during this encounter, and while he is "sure at some point" he could have exited the apartment, he did not feel he had time to exit after yelling for someone to get the dog. (Peters Dep., R. 45-7, PageID 594.) Peters contends that, after he yelled, Harris appeared at the top of the stairway, ran a third of the way down the stairs, and started yelling at Peters, though the audio recording does not capture Harris yelling at this point. Peters testified that Kane returned

between Peters's legs a second time after being kicked, and that he shot Kane at that point because he believed Kane was going to bite him.

Costley, the officer who was initially positioned outside 511 Blackstone, entered the plaintiffs' residence after hearing Peters's voice coming from inside the unit. Costley's police report states that, at the time he entered 513 Blackstone, Peters was "backed into the far corner of the small foyer area," and Kane "was at his legs growling and barking in a vicious manner." (Police Reports, R. 28-2, PageID 175.) Costley wrote that Peters "attempt[ed] to push the dog away with his foot," and Kane moved back but then "immediately began advancing toward [Peters] again, while continuing to growl[] and bark[] aggressively," at which point Peters shot Kane. (*Id.*)

The record is also unclear about the size of the foyer and Peters's location at the time of the shooting. The foyer is located between the front door and the stairwell that leads to the living room, but none of the witness testimony or photographs in the record provide a clear estimate of the foyer's dimensions. And the officers' accounts regarding Peters's location within the foyer differ: Peters repeatedly states in his deposition that he was standing just inside the door while he was inside the plaintiffs' home, but Costley testified that when he entered the plaintiffs' home through that same front door, Peters was backed into the far corner of the foyer area.

After the shooting, the audio recording captures Harris saying, "Why you shoot my dog, man?" (Peters Audio at 1:52.) Peters says, "He was [expletive] biting me, man." (*Id.* at 1:53.) But when deposed, Peters admitted that Kane never bit him. There, he testified that Kane was "biting at [him]," but Kane "did not make physical contact with [his] leg." (Peters Dep., R. 45-7, PageID 592, 595.) Harris also contends that Peters was flippant and even laughed during their conversation after the shooting, though Peters testified that he did not recall having laughed.

On September 29, 2016, Richards and Harris brought a cause of action against Peters, alleging that Peters unreasonably searched their home and seized Kane in violation of the Fourth Amendment and Michigan tort law. Peters moved for summary judgment on grounds of qualified immunity and Michigan governmental immunity. On August 27, 2018, the district court denied Peters's motion as to the Fourth Amendment, conversion, and gross negligence claims. Peters filed a timely notice of appeal.

Case No. 18-2024, *Richards v. City of Jackson*

## II. ANALYSIS

We begin with whether the district court erred in denying Peters qualified immunity for the plaintiffs' Fourth Amendment claims, and then address whether the district court erred in denying Peters governmental immunity under Michigan law for the plaintiffs' state-law claims.

### A. Qualified Immunity

In analyzing whether an official is entitled to qualified immunity, we must make two determinations: first, whether the plaintiffs have created a genuine dispute of material fact regarding whether the official deprived them of a constitutional right; and second, whether that right was clearly established such that a reasonable official would have known his actions were unconstitutional. *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560 (6th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts can address these inquiries in either order. *Id.* In undertaking each inquiry, we accept the "most favorable view of the facts to the plaintiff for purposes of the appeal." *Thompson v. Grida*, 656 F.3d 365, 367 (6th Cir. 2011).

Here, the district court denied Peters qualified immunity for two Fourth Amendment claims: first, the claim that the warrantless entry into the plaintiffs' home constituted an unreasonable search; and second, the claim that shooting and killing the plaintiffs' pet dog constituted an unreasonable seizure. We address each claim in turn.

#### 1. Unreasonable Search

In determining whether the district court erred in denying Peters qualified immunity for entering the plaintiffs' home, we begin with the question of whether the plaintiffs have presented a genuine dispute of material fact regarding whether Peters's entry into their home deprived them of their Fourth Amendment rights, and then analyze whether the right at issue was clearly established on November 28, 2014.

##### a. Constitutional Deprivation

The Fourth Amendment protects against unreasonable searches of an individual's home. U.S. Const. amend. IV. The Supreme Court has recognized that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. District Court* (*Keith*), 407 U.S. 297, 313 (1972); *see Florida v. Jardines*, 569 U.S. 1, 6 (2013).

- 6 -

"In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 589–90 (1980). The Supreme Court has taken this threshold seriously, making clear that "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much," and that "there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)). "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Id.* at 31.

Peters does not argue that he had a warrant, consent, or exigent circumstances to enter the home. Instead, his argument turns on whether he had entered the plaintiffs' home at all. Peters claims that he reasonably believed the front door led to a common entryway shared by multiple residences, and he argues that individuals have no "objectively reasonable expectation of privacy in the unlocked and open common hallway and stairway of [their] duplex." *United States v. Dillard*, 438 F.3d 675, 684 (6th Cir. 2006).

Peters's position elides a critical factual dispute: whether the foyer was in fact a common area. The plaintiffs vigorously dispute that the foyer was a common area—and the record supports their position. The district court rejected Peters's suggestion that the foyer was a common area, finding that each unit had its own door and that the plaintiffs were the only residents of the Blackstone building who had access to the foyer. We agree that the plaintiffs have demonstrated that Peters entered their home, not a common area.

Peters's remaining argument—that, even if he had entered the plaintiffs' home, he had "restricted his movement to the area of the apartment that was generally accessible to visitors to the property"—is unpersuasive. (Appellant Br. 29–31.) Richards's deposition makes clear that, although the living room and bedroom were at the top of the second set of stairs, everything inside the exterior door that Peters breached is part of the plaintiffs' apartment. Once Peters entered the plaintiffs' home, it did not matter whether he was in the front hallway where they accepted visitors

or in their bedroom—"any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much." *Kyllo*, 533 U.S. at 37.

      b.  Clearly Established

Even assuming his entry into the plaintiffs' home was unconstitutional, Peters argues that he reasonably believed the foyer was an entrance to a common area, and an officer who acts on a mistaken but reasonable belief is entitled to qualified immunity. This court has held that "a government employee will be shielded from liability so long as the employee acted under the objectively reasonable belief that his or her actions were lawful." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999); *see Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). Thus, at this stage of litigation, we must determine whether a jury could reasonably find that Peters's belief was not objectively reasonable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Peters contends that when he entered through an unlocked door in a multi-occupant building, he believed that the door would lead to a foyer from which he could access the doors to multiple interior units. In his deposition, Peters testified that, in Jackson, "[t]here are countless large homes with multiple apartments inside of that large building most of which you have to go into to get to the individual apartments, be it one, two, three, A, B, C," and, in his experience, the address markings on the exterior of such buildings would not always indicate that there were multiple units inside. (Peters Dep., R. 45-7, PageID 594.) But Peters also agreed that he had received no information from dispatch indicating that such subunits existed in this apartment, and that he was not asked to look for an individual in 513A, B, or C—he was simply told that Cox might be at 511 or 513 South Blackstone Street, each of which had its own door and address marking on the exterior of the home. The fact that *some* houses in Jackson have this design does not preclude a jury from finding that Peters was unreasonable in assuming that *this* house had such a feature.

The photographs of the home's exterior further undermine the reasonableness of Peters's belief: the clear address markings, individual mailboxes at each door, and the doorbell outside of the door marked 513 cut against the idea that this front door led to a common area rather than the entryway of an individual's home.

- 8 -

Case No. 18-2024, *Richards v. City of Jackson*

After considering all of the evidence, the district court found that "[w]hether it was unreasonable for Officer Peters to assume Plaintiffs' home consisted of multiple dwelling units, and he unlawfully entered Plaintiffs' home presents a genuine issue of material fact, which should be determined by the factfinder." (Order, R. 59, PageID 944.) We agree. Because there is a genuine dispute of material fact regarding whether Peters's belief that he had not entered the plaintiffs' home when he walked through their doorway was reasonable, we affirm the denial of qualified immunity as to this claim.

    *2. Unreasonable Seizure*

In determining whether the district court erred in denying Peters qualified immunity for shooting Kane, we begin with the question of whether the right at issue was clearly established on November 28, 2014, and then address whether the plaintiffs have presented a genuine issue of material fact regarding whether Peters's seizure of Kane violated the Fourth Amendment.

    a. Clearly Established

The Fourth Amendment protects against unreasonable seizures of an individual's property. U.S. Const. amend. IV. This court has acknowledged that "there is a constitutional right under the Fourth Amendment to not have one's dog unreasonably seized." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). In describing the contours of that right in *Brown*, we began with the premise that a "seizure becomes unlawful when it is more intrusive than necessary." *Id.* at 568 (citing *Florida v. Royer*, 460 U.S. 491, 504 (1983)). In determining whether a seizure of a dog was more intrusive than necessary, we reiterated the Supreme Court's holding that "a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion' and determine whether 'the totality of the circumstances justified [the] particular sort of . . . seizure.'" *Id.* (quoting *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013)).

In *Brown*, we concluded that shooting a pet dog is a "severe intrusion[,] given the emotional attachment between a dog and an owner." *Id.* at 568; *see San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975–78 (9th Cir. 2005) ("The emotional attachment to a family's dog is not comparable to a possessory interest in furniture."). But we also

Case No. 18-2024, *Richards v. City of Jackson*

found that ensuring "officer safety and preventing the destruction of evidence are particularly important governmental interests that the courts must strive to protect." *Brown*, 844 F.3d at 568. After balancing these interests, we found that "a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety." *Id.* We defined the requisite imminent threat as "'[a]n immediate, real threat to one's safety that justifies the use of force in self-defense,' or '[t]he danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself.'" *Id.* at 567 (quoting *Imminent Danger*, BLACK'S LAW DICTIONARY (10th ed. 2014)).

In defining the right at issue, we noted that a "large number" of our sister circuits had "already concluded that, 'the use of deadly force against a household pet is reasonable only if the pet poses an [imminent] danger and the use of force is unavoidable,'" and that every circuit to consider the issue "has concluded that the unreasonable killing of a dog constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Brown*, 844 F.3d at 566–67 (alterations in original) (collecting cases). Accordingly, we determined that the right not to have one's dog unreasonably seized "was clearly established in 2013," and we proceeded to determine whether the seizures at hand were reasonable. *Id.* at 567. We see no reason to depart from that course here.

Despite this court's holding in *Brown*, Peters argues that the right at issue was not clearly established for two reasons, neither of which is convincing. First, Peters argued that *Brown* was issued in 2016, which is later-in-time than the conduct at issue and therefore cannot suffice to clearly establish the law. This argument misreads *Brown*, where we unequivocally stated that the "constitutional right under the Fourth Amendment to not have one's dog unreasonably seized . . . was clearly established in 2013." *Brown*, 844 F.3d at 566–67. Because the right was clearly established in 2013, it was also clearly established when Peters shot Kane on November 28, 2014.

Second, Peters argues that he could not have been expected to anticipate our recognition in *Smith v. City of Detroit*, 751 F. App'x 691, 692 (6th Cir. 2018) that unlicensed dogs are property

- 10 -

Case No. 18-2024, *Richards v. City of Jackson*

under the Fourth Amendment.  Had Peters argued that he shot Kane because he believed Kane was unlicensed and that Harris and Richards had no property interest in an unlicensed dog, this argument might have some force.  But Peters gives no indication that he knew or even considered whether Kane was unlicensed at the time of the shooting.  *Cf. Smith*, 751 F. App'x at 697 ("As the district court observed, 'the officers did not shoot the dogs because they were unlicensed.  Rather, the officers . . . were not even aware that the dogs were unlicensed.'").  Thus, Peters's ability to anticipate this court's ruling in *Smith* has no bearing on whether Peters should reasonably have known that his actions were unconstitutional.

> b.  Constitutional Deprivation

We must next determine whether plaintiffs have raised a genuine dispute of material fact regarding whether Kane presented an imminent threat that justified Peters's decision to shoot Kane.  At this stage of the case, we are required to view the facts in the light most favorable to the plaintiffs, even where the only genuine dispute is created by the plaintiffs' "uncorroborated testimony" regarding the incident.  *Brown*, 844 F.3d at 571; *see Robinson*, 818 F.3d at 8–10 (finding that the district court erred in holding that the dog owner's uncorroborated testimony failed to create a genuine dispute of material fact).  Thus, for the purposes of the appeal, we must assume that when Peters announced his presence from inside the home, Kane ran down the stairs and growled but never advanced past the foot of the stairwell; that Kane did not lunge or bite at Peters; and that Harris was on his way down the stairs to get Kane at the time that Peters shot Kane.

We begin our analysis of whether the seizure in this case was reasonable with a closer look at *Brown*.  The specific facts in *Brown* led this court to conclude that no genuine dispute of material fact existed regarding the reasonableness of shooting two dogs.  In *Brown*, officers were executing a raid on the home of a suspect who "posed a serious threat to the officers' safety":  officers knew that the suspect had a criminal history, used firearms, and had deep ties to a large, tightly-knit gang.  844 F.3d at 568–69.  These circumstances placed the officers in *Brown* "on high alert going into the raid that other members of the gang could be in the residence and that they could be armed and dangerous."  *Id.* at 569.

Case No. 18-2024, *Richards v. City of Jackson*

In *Brown*, it was also undisputed that the dogs displayed signs of aggression beyond growling. The dogs began lunging toward the windows as the officers approached the front door. *Id.* at 569. The 97-pound dog jumped off the couch and lunged at the officers again as they entered the residence, which prompted an officer to fire at the dog. *Id.* at 563. Still, the dogs continued to obstruct the officers' path in the basement of the home. *Id.* Given the high risk presented by the suspect's firearm and gang activity, the officers' priority was to secure the basement and conduct a sweep for other potentially dangerous people in the home, and the officers testified they could not safely accomplish this goal with both dogs present. *Id.* at 563, 570. Despite having been shot once, the 97-pound dog turned toward the officers in the basement and started barking again, so another officer fired a round of shots, killing the dog. *Id.* at 563. The 53-pound dog was also in the middle of the basement, barking at officers as they attempted to enter and clear the area. *Id.* The same officer who had just shot the first dog fired at the second dog when he saw it barking at the officers, and a second officer fired at the dog again when it began moving toward him. *Id.*

In determining that shooting the dogs was not unreasonable, we emphasized that the plaintiffs in *Brown* failed to rebut several undisputed material facts: namely, that a "large" dog had "lunged" at the officer before he shot the dog, and that the officers were "unable to safely clear the basement with both dogs there." *Id.* at 570. The court also reiterated the suspect's criminal history and gang affiliations, "the fact that the officers had no time to plan for the dogs," "the nature and size of the dogs," and "the fact that the dogs were unleashed and loose in a small residence." *Id.* at 572. Considering each of these factors as part of the totality of the circumstances, we found the plaintiffs failed to create a genuine dispute of material fact regarding whether a dog that was "barking and lunging at the officers as they breached the entryway" posed such an imminent threat to the officers that "it was necessary to shoot the dog in order for them to safely sweep the residence" and ensure no dangerous people were present. *Id.* at 570.

The facts of *Brown* bear some similarities to those presented here. Like in *Brown*, Peters did not know about the dog in advance and had no time to plan for how to handle the dog's presence. *Brown*, 844 F.3d at 572. Additionally, Kane was off-leash in what appears to have been a small area. But several meaningful differences make this case distinguishable from *Brown*.

- 12 -

First, the level of aggression described in *Brown* is a common theme in cases where courts have found that a seizure of a dog was reasonable. *See Robinson v. Pezzat*, 818 F.3d 1, 12 (D.C. Cir. 2016) ("Given that [the dog] bit [an officer] hard enough to puncture her leather boots, [the officer's] belief—just seconds later—that the dog continued to pose an imminent threat even absent additional aggressive behavior was hardly unreasonable."); *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir. 2003) (finding seizures were reasonable where officers had knowledge that the dogs had previously attacked or behaved aggressively toward other humans). Taking the facts in the light most favorable to the plaintiffs, Kane displayed a significantly lower level of aggression. Here, Peters's only reason to believe that Kane presented an imminent threat was that he ran down the stairs and growled when an unknown person entered his home. As the district court noted, this behavior is distinguishable from more serious displays of aggression akin to lunging or biting because "descending stairs, barking, and growling" is "naturally expected of a dog when a stranger enters its home." (Order, R. 59, PageID 945.) *See Robinson*, 818 F.3d at 11 ("A jury could regard . . . Wrinkles' barking at the police—as would most any self-respecting dog—to be of limited probative value[.]"). We do not hold today that a dog must bite an officer before he can fire his weapon. But a jury could reasonably find that the absence of any aggression apart from growling is a factor that cuts toward unreasonableness in assessing the totality of the circumstances.

Furthermore, the context of the seizure is dramatically different from that in *Brown*. Unlike the officers in *Brown*, Peters was dealing with only one dog. *Id.* at 570, 572; *Altman*, 330 F.3d at 206 ("Obviously, the danger presented by a dog increases significantly when that dog joins others in a pack."). And, here, there was no intimation of high-risk gang activity or any similar level of threat inside the home that would require Peters to conduct a sweep to ensure his safety. Rather, Peters had been dispatched to look for a man who had failed to pick up his medication from a local hospital. As discussed above, Peters did not even have a warrant to enter the home in question, let alone a need to conduct a thorough search or sweep of the premises that might necessitate seizing the dog to safely clear the scene. *Cf. Brown*, 844 F.3d at 563, 570.

- 13 -

Case No. 18-2024, *Richards v. City of Jackson*

Relatedly, the questionable validity of the search distinguishes this case from *Brown*. Although the primary question in an excessive force case is typically "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances," *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)), this court has acknowledged that where "the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used." *Bletz v. Gribble*, 641 F.3d 743, 750–52 (6th Cir. 2011) (citing *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (noting that the officer's "actions preceding the shooting were not those of an objectively reasonable police officer" in finding that the officer's use of force was objectively unreasonable)). Because the audio recording suggests that Peters's relevant conduct—from the time he entered the home to the time at which he shot Kane—occurred within 17 seconds, a jury could reasonably find that Peters's unlawful entry preceding the shooting as an additional factor cutting against the reasonableness of the seizure.

Several additional unresolved facts suggest that a genuine dispute of material fact remains regarding whether the seizure was reasonable. For example, the uncertainty in the record regarding the size of the foyer and Peters's location in the foyer at the time of the shooting makes it difficult to tell whether Kane posed an imminent threat to Peters from the foot of the stairwell. A jury could reasonably find that a growling dog standing several feet away from the officer does not present the same type of imminent threat as a dog who is lunging toward the officer.

The record also contains no information about Kane's size. In *Brown*, this court looked to the "nature and size of the dogs," noting that the record demonstrated that one dog was 97 pounds and the other was 53 pounds. In contrast, none of the police reports or depositions in this case even describes Kane as "large" or "small." The lack of information about size matters, as a jury could reasonably find that the threat posed by a 30-pound dog is meaningfully less severe than that posed by the 97- and 53-pound dogs described in *Brown*. *See* United Kennel Club, *American Pit Bull Terrier* (May 1, 2017) (describing weight range); American Dog Breeders Association, *The ADBA Heritage American Pit Bull Terrier Conformation Standard* (Jan. 27, 2018) (same). And

as for Kane's "nature," the only undisputed facts about Kane's behavior in the record are that he had never been aggressive toward other people or animals in the five years he had lived with the plaintiffs, apart from growling when a stranger unexpectedly entered his home.

In light of all the considerations enumerated above—the lack of aggression beyond the common dog behaviors of running down the stairs and growling at a stranger in the home; the absence of high-risk criminal activity that might require seizing the dog to safely sweep the premises; Peters's unlawful entry into the home where he shot the dog; the material disputes in the record regarding the distance between Peters and the dog; and the lack of any record facts regarding Kane's size or weight—we conclude that the plaintiffs have created a genuine dispute of material fact regarding whether Kane posed an imminent threat that justified Peters's decision to shoot.

### B. Michigan Governmental Immunity

Peters next argues that the district court erred in denying Michigan governmental immunity on the plaintiffs' state-law claims of gross negligence and conversion. Michigan governmental immunity functions differently for intentional torts and torts that require only negligence, *Odom v. Wayne Cty.*, 482 Mich. 459, 470 (2008), so we begin with the intentional tort of conversion and then proceed to the gross negligence claim.

#### 1. Conversion

Richards and Harris alleged that Peters committed the intentional tort of conversion under Michigan law, because killing Kane was "a distinct act of dominion wrongfully exerted over Plaintiff's dog in denial of or inconsistent with Plaintiffs' rights," and Peters's conduct proximately caused the injuries and damages that resulted. (Compl., R. 1, PageID 10.) *See Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992) (defining conversion).

Michigan governmental employees are immune from intentional tort liability when they can establish that "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom*, 482 Mich. at 461. The parties dispute only the second element: whether a jury could reasonably find Peters did not act in good faith.

- 15 -

Case No. 18-2024, *Richards v. City of Jackson*

The good-faith requirement "imposes a subjective test for governmental immunity for intentional torts, based on the officials' state of mind, in contrast to the objective test for federal qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015); *Odom*, 482 Mich. at 481–82. Peters argues that he acted under the good-faith belief that shooting Kane was necessary to defend himself from imminent harm. But plaintiffs contend Peters's actions were not taken in good faith, arguing that the record evidence supports a finding that Peters "took no efforts to bring to a halt his chain of unlawful conduct that ultimately led to the unjustified destruction of Kane and resultant wrongful conversion of [plaintiffs]' personal property," because Peters "knew or should have known that he was not permitted to enter into [plaintiffs]' home, he knew that he was unlawfully on their premises once inside, and, instead of retreating or giving Plaintiff-Appellee Eddie the opportunity to grab Kane, [Peters] maliciously executed the pet within 6 seconds." (Appellee Br. 40.) We believe that the record supports a jury finding in favor of either party on this issue. Because a genuine dispute of material fact remains, we affirm.

### 2. *Gross Negligence*

Richards and Harris also alleged that, as a police officer, Peters "had a duty to perform [his] employment activities so as not to endanger or cause harm to Plaintiffs," and he "breached his duties with deliberate indifference and gross negligence and without regard to Plaintiffs' rights and welfare, which caused serious injuries and damages to Plaintiffs." (Compl., R. 1, PageID 12.) Peters contends that his intentional acts of entering the foyer and shooting the dog correspond to the intentional torts of trespass and conversion, and "[g]ross negligence 'is not an independent cause of action' when the underlying claim is an intentional [tort] by an officer." *Presnall v. Huey*, 657 F. App'x 508, 513 (6th Cir. 2016) (quoting *Bletz*, 641 F.3d at 756).

Peters is correct that "Michigan 'has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" *Miller v. Sanilac Cty.*, 606 F.3d 240, 254 (6th Cir. 2010) (quoting *VanVorous v. Burmeister*, 262 Mich. App. 467, 483 (2004), *overruled on other grounds by Odom*, 482 Mich. 459). But "plaintiffs are barred from bringing gross-negligence claims only if those claims are 'fully premised' on alleged intentional torts." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 700–01 (6th Cir. 2018), *cert. denied*,

Case No. 18-2024, *Richards v. City of Jackson*

139 S. Ct. 1551 (2019) (quoting *VanVorous*, 262 Mich. App. at 483). This court has sustained gross-negligence claims premised on allegations that officers were "grossly negligent in failing to follow certain procedures and statutory obligations" or where the plaintiff can otherwise "show that the defendant owed him a duty of care." *Id.* at 701 (citing *Cummins v. Robinson Twp.*, 283 Mich. App. 677, 692 (2009)).

In *Bell v. Porter*, 739 F. Supp. 2d 1005 (W.D. Mich. 2010), the district court upheld a plaintiff's gross negligence claim based on an officer's breach of similar duties: "to avoid foreseeable injury to plaintiff while investigating or pursuing legitimate police activity" and "to avoid conduct or failure to act that is so reckless that it demonstrates a substantial lack of concern for whether injury will result." *Id.* at 1015. Like in *Bell*, the plaintiffs' allegation of gross negligence here is "based on the same incident" as the intentional torts Peters describes, but the plaintiffs have "adequately alleged an alternative basis for the claim." *Id.* Thus, the allegation in the complaint that Peters breached his "duty to perform [his] employment activities so as not to endanger or cause harm to Plaintiffs" is sufficiently distinct from the separately-pleaded intentional torts. (Compl., R. 1, PageID 12.)

Finally, Peters argues that his conduct was not the proximate cause of the plaintiffs' injury, because he claims that Kane's aggressive behavior and Harris's inability to gain control also contributed to Kane's death. This argument is uncompelling. The Michigan Supreme Court has held that a government official can only be deprived of immunity for gross negligence claims if his actions were "the one most immediate, efficient, and direct cause of the injury or damage." *Robinson v. City of Detroit*, 462 Mich. 439, 462 (2000). Here, the "one most immediate, efficient, and direct cause of the injury or damage" to Kane (and, consequently, to the plaintiffs) was undoubtedly Peters's decision to fire his weapon and kill the plaintiffs' dog. *Id.* Thus, we affirm the denial of Peters's motion for summary judgment.

### III. CONCLUSION

For the foregoing reasons, we affirm.

- 17 -